**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

CITY OF BERWYN, ILLINOIS;
TOWN OF CICERO, ILLINOIS;
CITY OF DOVER, OHIO;
CITY OF FOLSOM, CALIFORNIA;
CITY OF GUSTAVUS, ALASKA;
VILLAGE OF HAZEL CREST, ILLINOIS;
CITY OF KING CITY, CALIFORNIA;
CITY OF KODIAK, ALASKA;
LIBERTY TOWNSHIP, DELAWARE COUNTY, OHIO;
VILLAGE OF MELROSE PARK, ILLINOIS;
CITY OF NEW BRITAIN, CONNECTICUT;
CITY OF PERRY, OKLAHOMA;
CITY OF REVERE, MASSACHUSETTS;
VILLAGE OF ROBBINS, ILLINOIS;
ROCKDALE COUNTY, GEORGIA;
CITY OF SANTA FE SPRINGS, CALIFORNIA;
CITY OF SOLEDAD, CALIFORNIA;
CITY OF STATESBORO, GEORGIA;
VILLAGE OF STICKNEY, ILLINOIS;
CITY OF UKIAH, CALIFORNIA;
CITY OF YORK, SOUTH CAROLINA; and
CITY OF ZION, ILLINOIS,

Plaintiffs,

v.

3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY);
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC;
CORTEVA, INC.;
DUPONT DE NEMOURS, INC.;
E.I. DU PONT DE NEMOURS AND COMPANY, n/k/a EIDP, INC.;
ELEVATE TEXTILES, INC.;
FIRE-DEX, LLC;
FIRE-DEX GW, LLC;

In re: Non-AFFF Firefighter Turnout Gear Marketing, Sales Practices, and Products Liability Litigation

MDL No. 3191

Case No.

GLOBE MANUFACTURING COMPANY, LLC;
HONEYWELL INTERNATIONAL INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
INNOTEX CORP.;
THE INTERTECH GROUP, INC.;
LION GROUP, INC.;
MILLIKEN & COMPANY;
MORNING PRIDE MANUFACTURING, L.L.C. (d/b/a HONEYWELL FIRST RESPONDER PRODUCTS);
PBI PERFORMANCE PRODUCTS, INC.;
SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.;
SOUTHERN MILLS, INC. (d/b/a TENCATE PROTECTIVE FABRICS);
STEDFAST USA, INC.; and
W.L. GORE & ASSOCIATES, INC.,

Defendants.

**MULTI-PLAINTIFF COMPLAINT**
**(Non-AFFF Firefighter Turnout Gear)**
**JURY TRIAL DEMANDED**

## I. PRELIMINARY STATEMENT

1. This is a civil action brought by public entities, each suing on its own behalf, to recover the substantial costs they have incurred, and will incur, because the structural firefighter protective clothing known as turnout gear that they purchased was manufactured with, treated with, and contaminated by per- and polyfluoroalkyl substances (PFAS). PFAS substances are a family of synthetic chemicals commonly called "forever chemicals" because they do not meaningfully break down in the human body or the environment.

2. For decades, Defendants knew that PFAS are toxic, persistent, and bioaccumulative, and that human exposure to PFAS is associated with cancer, thyroid disease, immune suppression, reproductive and developmental harm, and other serious diseases. Defendants nonetheless designed, manufactured, supplied, marketed, and sold turnout gear and turnout-gear components containing PFAS, and represented that gear to be safe and protective for the firefighters and fire departments that relied on it.

3. Defendants concealed and misrepresented the presence and dangers of PFAS in turnout gear. They did so to protect a lucrative market for PFAS chemistries and PFAS-containing personal protective equipment, and to avoid the cost of reformulation, warning, and remediation. Firefighters and the public entities that equip them were kept in the dark while PFAS migrated from the gear onto skin, into fire stations, and into the equipment used to store and launder that gear.

4. Plaintiffs are municipalities, counties, utility and fire districts, boroughs, and other public entities that purchased PFAS-containing turnout gear and that now bear the cost of testing, retrieving, removing, disposing of, and replacing that gear, along with the loss of the benefit of the bargain they were promised. Each named Plaintiff brings this action on

behalf of itself to hold Defendants accountable for the economic harm and property damage incurred.

5. This action concerns firefighter turnout gear only. Plaintiffs do not assert, and expressly disclaim in this Complaint, any claim arising from or relating to aqueous film-forming foam (AFFF) or any other firefighting foam. No allegation herein is intended to state a claim within the scope of the AFFF Products Liability Litigation in MDL No. 2873.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action under 28 U.S.C. 1331 because this action arises in part under the laws of the United States, namely the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1962 and 1964, which provides a private right of action under 18 U.S.C. 1964(c).

7. This Court has supplemental jurisdiction under 28 U.S.C. 1367 over the state-law claims asserted herein because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

8. This Court also has diversity jurisdiction under 28 U.S.C. 1332(a), pleaded in the alternative, over those Plaintiffs whose claims independently satisfy complete diversity of citizenship and the amount-in-controversy requirement, exclusive of interest and costs.

9. This Court has general personal jurisdiction over Defendant 3M Company, which is headquartered and maintains its principal place of business in Minnesota and is therefore at home in this District.

10. This Court has specific personal jurisdiction over each of the remaining Defendants with respect to the claims asserted in this action because each such Defendant

purposefully directed its conduct at the relevant forum and the claims arise out of and relate to that conduct. Each such Defendant marketed, advertised, and sold PFAS-containing turnout gear into the relevant forum on a sustained and systematic basis; established, authorized, and supplied dealers, distributors, and sales representatives in the forum; accepted orders from and shipped PFAS-containing turnout gear to fire departments and other purchasers in the forum; and derived substantial revenue from the sale and use of PFAS-containing turnout gear in the forum. Plaintiffs will identify the specific dealers, sales representatives, purchase orders, invoices, and shipments establishing these contacts following discovery.

11. The claims of each Plaintiff arise out of and relate to these forum-directed contacts because each Plaintiff purchased, was issued, and used the Defendants' PFAS-containing turnout gear in its own State, was not warned of the presence or hazards of PFAS in its own State, and incurred its injuries in its own State. The exercise of personal jurisdiction over each Defendant is therefore consistent with due process. Coordination or transfer of this action for pretrial purposes is without prejudice to the proper venue for trial of any Plaintiff's claims.

12. Venue is proper in this District under 28 U.S.C. 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because one or more Defendants reside in or are subject to personal jurisdiction in this District.

13. This action is related to and appropriate for coordination or consolidation in In re: Non-AFFF Firefighter Turnout Gear Marketing, Sales Practices, and Products Liability Litigation, MDL No. 3191, pending in this District before the Honorable Jeffrey M.

Bryan. This Complaint is filed to promote the just and efficient conduct of the coordinated proceedings.

## III. PARTIES

### A. Plaintiffs

14. The named Plaintiffs are public entities, including municipalities, counties, utility and fire districts, boroughs, and volunteer fire departments, that own, fund, and/or operate fire departments, and that purchased, were issued, and used firefighter turnout gear that was manufactured, supplied, applied, and/or treated with PFAS by one or more Defendants. Each named Plaintiff has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. Each named Plaintiff brings this action on behalf of itself.

15. **City of Berwyn.** Plaintiff City of Berwyn, Illinois, is an Illinois municipal corporation. It owns, funds, and operates the Berwyn Fire Department, which operates 3 fire stations and is staffed by approximately 82 firefighters. The Berwyn Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Globe brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

16. **Town of Cicero.** Plaintiff Town of Cicero, Illinois, is an Illinois municipal corporation. It owns, funds, and operates the Cicero Fire Department, which operates 3 fire stations and is staffed by approximately 63 firefighters. The Cicero Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Ricochet, Globe, and Fire-Dex brand(s). The Town has incurred and will

continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The Town brings this action on behalf of itself.

17. **City of Dover.** Plaintiff City of Dover, Ohio, is an Ohio municipal corporation. It owns, funds, and operates the Dover Fire Department, which operates 2 fire stations and is staffed by approximately 25 firefighters. The Dover Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lion brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

18. **City of Folsom.** Plaintiff City of Folsom, California, is a California municipal corporation. It owns, funds, and operates the Folsom Fire Department, which operates 6 fire stations and is staffed by approximately 75 firefighters. The Folsom Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lion brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

19. **City of Gustavus.** Plaintiff City of Gustavus, Alaska, is an Alaska municipal corporation. It owns, funds, and operates the Gustavus Fire Department, which operates 1 fire station and is staffed by approximately 21 firefighters. The Gustavus Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lion brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

20. **Village of Hazel Crest.** Plaintiff Village of Hazel Crest, Illinois, is an Illinois municipal corporation. It owns, funds, and operates the Hazel Crest Fire Department, which operates 2 fire stations and is staffed by approximately 20 firefighters. The Hazel Crest Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Morning Pride brand(s). The Village has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The Village brings this action on behalf of itself.

21. **City of King City.** Plaintiff City of King City, California, is a California municipal corporation. It owns, funds, and operates the King City Fire Department, which operates 1 fire station and is staffed by approximately 25 firefighters. The King City Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Globe brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

22. **City of Kodiak.** Plaintiff City of Kodiak, Alaska, is an Alaska municipal corporation. It owns, funds, and operates the Kodiak Fire Department, which operates 1 fire station and is staffed by approximately 15 firefighters. The Kodiak Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lakeland brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

23. **Liberty Township.** Plaintiff Liberty Township, Delaware County, Ohio, is an Ohio township. It owns, funds, and operates the Liberty Township Fire Department,

which operates 2 fire stations and is staffed by approximately 30 firefighters. The Liberty Township Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Innotex brand(s). The Township has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The Township brings this action on behalf of itself.

24. **Village of Melrose Park.** Plaintiff Village of Melrose Park, Illinois, is an Illinois municipal corporation. It owns, funds, and operates the Melrose Park Fire Department, which operates 1 fire station and is staffed by approximately 35 firefighters. The Melrose Park Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Globe brand(s). The Village has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The Village brings this action on behalf of itself.

25. **City of New Britain.** Plaintiff City of New Britain, Connecticut, is a Connecticut municipal corporation. It owns, funds, and operates the New Britain Fire Department, which operates 6 fire stations and is staffed by approximately 130 firefighters. The New Britain Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lion (including the Lion V-Force line) brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

26. **City of Perry.** Plaintiff City of Perry, Oklahoma, is an Oklahoma municipal corporation. It owns, funds, and operates the Perry Fire Department, which operates 1 fire station and is staffed by approximately 34 firefighters. The Perry Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear

bearing the Fire-Dex brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

27. **City of Revere.** Plaintiff City of Revere, Massachusetts, is a Massachusetts municipal corporation. It owns, funds, and operates the Revere Fire Department, which operates 5 fire stations and is staffed by approximately 110 firefighters. The Revere Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Morning Pride brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

28. **Village of Robbins.** Plaintiff Village of Robbins, Illinois, is an Illinois municipal corporation. It owns, funds, and operates the Robbins Fire Department, which operates 1 fire station and is staffed by approximately 17 firefighters. The Robbins Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lakeland brand(s). The Village has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The Village brings this action on behalf of itself.

29. **Rockdale County.** Plaintiff Rockdale County, Georgia, is a political subdivision of the State of Georgia, by and through its Board of Commissioners. It owns, funds, and operates the Rockdale County Fire Rescue, which operates 10 fire stations and is staffed by approximately 150 firefighters. The Rockdale County Fire Rescue purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lion brand(s). The County has incurred and will continue to incur costs to test, retrieve,

remove, dispose of, and replace that PFAS-containing gear. The County brings this action on behalf of itself.

30. **City of Santa Fe Springs.** Plaintiff City of Santa Fe Springs, California, is a California municipal corporation. It owns, funds, and operates the Santa Fe Springs Fire Department, which operates 4 fire stations and is staffed by approximately 45 firefighters. The Santa Fe Springs Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lion brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

31. **City of Soledad.** Plaintiff City of Soledad, California, is a California municipal corporation. It owns, funds, and operates the Soledad Fire Department, which operates 1 fire station and is staffed by approximately 9 firefighters. The Soledad Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Globe brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

32. **City of Statesboro.** Plaintiff City of Statesboro, Georgia, is a Georgia municipal corporation. It owns, funds, and operates the Statesboro Fire Department, which operates 2 fire stations and is staffed by approximately 70 firefighters. The Statesboro Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lion brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

33. **Village of Stickney.** Plaintiff Village of Stickney, Illinois, is an Illinois municipal corporation. It owns, funds, and operates the Stickney Fire Department, which operates 1 fire station and is staffed by approximately 42 firefighters. The Stickney Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Fire-Dex brand(s). The Village has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The Village brings this action on behalf of itself.

34. **City of Ukiah.** Plaintiff City of Ukiah, California, is a California municipal corporation. It owns, funds, and operates the Ukiah Fire Department, which operates 4 fire stations and is staffed by approximately 42 firefighters. The Ukiah Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Lion brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

35. **City of York.** Plaintiff City of York, South Carolina, is a South Carolina municipal corporation. It owns, funds, and operates the York Fire Department, which operates 1 fire station and is staffed by approximately 16 firefighters. The York Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Globe brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

36. **City of Zion.** Plaintiff City of Zion, Illinois, is an Illinois municipal corporation. It owns, funds, and operates the Zion Fire Department, which operates 2 fire stations and

is staffed by approximately 30 firefighters. The Zion Fire Department purchased, was issued, and used PFAS-containing structural turnout gear, including gear bearing the Innotex, Fire-Dex, TecGen 71, and Globe brand(s). The City has incurred and will continue to incur costs to test, retrieve, remove, dispose of, and replace that PFAS-containing gear. The City brings this action on behalf of itself.

**B. Defendants**

37. Defendants are the chemical manufacturers that made and sold PFAS and PFAS-based chemistries, the manufacturers of finished turnout gear, and the manufacturers and suppliers of the PFAS-containing textiles, membranes, and other components used in turnout gear. Each Defendant is identified below.

**(1) PFAS Chemical Manufacturer Defendants**

38. **3M Company**. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) is a corporation organized under the laws of the State of Delaware, with its principal place of business in St. Paul, Minnesota. 3M designed, manufactured, marketed, and sold PFAS and PFAS-based chemistries used in the manufacture and treatment of firefighter turnout gear and its components. In addition, 3M manufactured, marketed, and sold turnout gear products that were made with or, in the ordinary course of manufacturing became contaminated with PFAS chemicals. Such firefighter turnout gear products include Scotchlite reflective tape and Scott self-contained breathing apparatuses (SCBA). These products were made with and/or became contaminated by PFAS chemicals in the ordinary course of manufacturing. Such products became the industry standard, and almost every fire department, without exception, had and has in their inventory firefighting personal protective products containing Scotchlite

reflective tape and had and has in its inventory SCBAs manufactured by 3M that contained or contain PFAS chemicals.

39. **EIDP, Inc**. Defendant E.I. du Pont de Nemours and Company, n/k/a EIDP, Inc., is a corporation organized under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware. It designed, manufactured, and supplied PFAS and PFAS-based chemistries incorporated into turnout gear and its components.

40. **Dupont de Nemours**. Defendant DuPont de Nemours, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware. It is a successor to, and affiliate of, the DuPont PFAS businesses and is responsible for the PFAS-related liabilities alleged herein.

41. **The Chemours Company**. Defendant The Chemours Company is a corporation organized under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware. It manufactures and sells PFAS and fluoropolymer chemistries, including chemistries used in turnout gear components, that were spun off from DuPont.

42. **The Chemours Company FC, LLC**. Defendant The Chemours Company FC, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware. It manufactures and sells fluoropolymer and PFAS products used in the manufacture and treatment of turnout gear components.

43. **Corteva, Inc**. Defendant Corteva, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware. It is a successor to, and affiliate of, the DuPont businesses and is responsible for the PFAS-related liabilities alleged herein.

44. Defendants E.I. du Pont de Nemours and Company (n/k/a EIDP, Inc.), DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc. (collectively, the DuPont Defendants) are liable for the PFAS-related conduct and liabilities alleged in this Complaint notwithstanding a series of corporate reorganizations undertaken by the former E.I. du Pont de Nemours and Company.

45. In 2015, the former E.I. du Pont de Nemours and Company spun off its performance-chemicals business, including its PFAS business, as a separate publicly traded company, The Chemours Company, and Chemours, including The Chemours Company FC, LLC, assumed liabilities relating to PFAS. In 2017, E.I. du Pont de Nemours and Company combined into DowDuPont, and in 2019 that entity separated into separate publicly traded companies, including DuPont de Nemours, Inc. and Corteva, Inc., with Corteva holding EIDP, Inc. as a subsidiary. Through these transactions, the DuPont Defendants assumed, retained, or allocated among themselves the PFAS-related liabilities alleged in this Complaint.

46. The former DuPont structured these reorganizations in an effort to insulate itself from its PFAS liabilities. As a Chemours executive testified before Congress, DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities. Each of the DuPont Defendants is jointly and severally liable for the PFAS-related liabilities alleged in this Complaint.

**(2) Turnout Gear Manufacturer Defendants (Finished PPE)**

47. **Globe Mfrg. Co. LLC**. Defendant Globe Manufacturing Company, LLC is a limited liability company organized under the laws of the State of New Hampshire, with its principal place of business in Pittsfield, New Hampshire. It designed, manufactured,

marketed, and sold finished firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

48. **Lion Group, Inc**. Defendant Lion Group, Inc. is a corporation organized under the laws of the State of Ohio, with its principal place of business in Dayton, Ohio. It designed, manufactured, marketed, and sold finished firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

49. **Fire-Dex, LLC**. Defendant Fire-Dex, LLC is a limited liability company organized under the laws of the State of Ohio, with its principal place of business in Medina, Ohio. It designed, manufactured, marketed, and sold finished firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

50. **Fire-Dex GW, LLC**. Defendant Fire-Dex GW, LLC is a limited liability company organized under the laws of the State of Ohio, with its principal place of business in Medina, Ohio. It designed, manufactured, marketed, and sold finished firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

51. **Morning Pride Mfrg., LLC**. Defendant Morning Pride Manufacturing, L.L.C. (d/b/a Honeywell First Responder Products) is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Golden Valley, Minnesota. It designed, manufactured, marketed, and sold finished firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

52. **Honeywell Safety Products USA, Inc**. Defendant Honeywell Safety Products USA, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. It marketed and sold finished

firefighter turnout gear and related protective equipment that was knowingly contaminated with PFAS chemicals.

53. **Honeywell International Inc**. Defendant Honeywell International Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. It marketed and sold firefighter turnout gear through its subsidiaries and affiliated brands that was knowingly contaminated with PFAS chemicals.

54. **Innotex Corp**. Defendant Innotex Corp. is a Canadian corporation with its principal place of business in Quebec, Canada, and a United States location in Ohatchee, Alabama. It designed, manufactured, marketed, and sold finished firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

**(3) Component, Textile, and Membrane Manufacturer Defendants**

55. **W. L. Gore & Associates, Inc**. Defendant W.L. Gore & Associates, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Newark, Delaware. It manufactured and supplied the moisture barrier membrane and laminate, including expanded polytetrafluoroethylene, used in firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

56. **Milliken & Company**. Defendant Milliken & Company ("Milliken") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Spartanburg, South Carolina. Milliken acquired Springfield, LLC in 2015 and Milliken is the successor-in-interest of Springfield. Milliken manufactured and supplied textiles and textile finishes used in firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

57. **Elevate Textiles, Inc**. Defendant Elevate Textiles, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. It manufactured and supplied performance textiles used in firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

58. **Safety Components Fabric Technologies, Inc**. Defendant Safety Components Fabric Technologies, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Greenville, South Carolina. It manufactured and supplied outer-shell fabrics used in firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

59. **Stedfast USA, Inc**. Defendant Stedfast USA, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Piney Flats, Tennessee. It manufactured and supplied moisture-barrier substrates and laminates used in firefighter turnout gear that was knowingly contaminated with PFAS chemicals.

60. **PBI Performance Products, Inc**. Defendant PBI Performance Products, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. It manufactured and supplied high-performance fibers and fabrics that it knew would be incorporated into other manufacturers' component parts that would be used in firefighter turnout gear that would be contaminated with PFAS chemicals. In addition, it associated with and partnered with other component manufacturers to produce products incorporating its fibers and fabrics that it knew would be contaminated with PFAS chemicals.

61. **Southern Mills, Inc**. Defendant Southern Mills, Inc. (d/b/a TenCate Protective Fabrics) is a corporation organized under the laws of the State of Georgia, with its

principal place of business in Senoia, Georgia. It manufactured and supplied outer shell and thermal liner fabrics used in firefighter turnout gear that it knew was contaminated with PFAS chemicals.

62. **InterTech Group, Inc**. Defendant The InterTech Group, Inc. is a corporation organized under the laws of the State of South Carolina, with its principal place of business in North Charleston, South Carolina. It was a parent or affiliated entity that manufactured and supplied textile materials used in firefighter turnout gear that it knew was contaminated with PFAS chemicals.

63. At all relevant times, each Defendant acted individually and as the agent, servant, co-venturer, or co-conspirator of the other Defendants, and acted within the course and scope of that agency, joint venture, or concert of action. Each Defendant ratified, authorized, and adopted the acts of the other Defendants alleged herein. Each Defendant is jointly and severally liable for the conduct alleged, and acted in concert with the others to achieve a common purpose.

64. For convenience, Defendants are referred to collectively and by group. The "Chemical Defendants" are the PFAS Chemical Manufacturer Defendants identified above. The "Gear Manufacturer Defendants" are the Turnout Gear Manufacturer Defendants identified above. The "Component Defendants" are the Component, Textile, and Membrane Manufacturer Defendants identified above. "Defendants" refers to all of the foregoing collectively.

## IV. FACTUAL ALLEGATIONS

### A. PFAS Are Hazardous, Persistent, and Bioaccumulative

65. PFAS are a family of thousands of synthetic fluorinated chemicals characterized by carbon-fluorine bonds, among the strongest bonds in organic chemistry. That bond

strength makes PFAS extraordinarily resistant to breakdown, so that they persist in the human body and the environment for years or longer, earning the label "forever chemicals."

66. PFAS are bioaccumulative and toxic. They accumulate in human blood, tissue, and organs with repeated exposure. Peer-reviewed scientific and epidemiological studies have associated exposure to PFAS, including PFOA and PFOS, with kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, pregnancy-induced hypertension, immune suppression, and elevated cholesterol, among other adverse effects.

67. Regulators and public-health authorities have recognized the hazards of PFAS. The United States Environmental Protection Agency has set health advisory and enforceable limits for certain PFAS in drinking water at parts-per-trillion levels, and has designated certain PFAS as hazardous substances. Numerous States have enacted restrictions on PFAS in consumer products, including in firefighter protective clothing.

68. A growing number of States have recognized the hazards of PFAS in firefighter turnout gear and have enacted statutes that require the disclosure or labeling of PFAS in firefighter personal protective equipment, or that mandate its phase-out, reflecting a broad legislative recognition that PFAS in turnout gear is a serious and avoidable hazard, that non-PFAS turnout gear is available, and that public entities such as the Plaintiffs are being compelled to test, replace, and dispose of the PFAS-containing gear that the Defendants designed, manufactured, marketed, and sold. These enactments include the following:

(a) **California.** California requires point-of-sale written notice that firefighter personal protective equipment contains PFAS (Cal. Health and Safety Code

13029) and, under Assembly Bill 1181 (2025), has directed the Division of Occupational Safety and Health to adopt a standard and timeline to phase out PFAS in firefighter turnout gear beginning in 2028.

(b) **Colorado.** Colorado requires a manufacturer that sells firefighter personal protective equipment containing PFAS to provide written notice to the purchaser at the time of sale (Colo. Rev. Stat. 25-5-1305), as part of a broader statutory program restricting intentionally added PFAS in consumer products.

(c) **Connecticut.** Connecticut requires disclosure of PFAS in firefighter protective equipment beginning January 1, 2026, and prohibits the sale or distribution of covered products, including firefighter turnout gear, containing intentionally added PFAS beginning January 1, 2028 (Conn. Pub. Act No. 24-59).

(d) **Illinois.** Illinois requires the reporting and disclosure of PFAS in firefighter personal protective equipment and restricts PFAS-containing firefighter equipment (2025 Ill. Laws (H.B. 2409)).

(e) **Indiana.** Indiana requires that firefighter gear bear a label stating whether it contains PFAS and, since June 30, 2024, prohibits fire departments from purchasing firefighter gear that does not carry such a label (Ind. House Enrolled Act 1341 (2023)).

(f) **Maine.** Maine regulates firefighter personal protective equipment under its comprehensive PFAS-in-products statute, which requires reporting of intentionally added PFAS and phases in a prohibition on the sale of products

containing intentionally added PFAS, with restrictions extending through 2032 (38 M.R.S. 1614).

(g) **Maryland.** Maryland requires a person that sells firefighter personal protective equipment containing PFAS to provide written notice to the purchaser at the time of sale (Md. Code, Envir. 6-1603).

(h) **Massachusetts.** Massachusetts has required manufacturers to disclose intentionally added PFAS in firefighter personal protective equipment since January 1, 2025, and prohibits the manufacture, sale, and distribution of firefighter personal protective equipment containing intentionally added PFAS beginning January 1, 2027 (2024 Mass. Acts ch. 182 (S. 2902)).

(i) **Minnesota.** Minnesota regulates firefighter personal protective equipment under its comprehensive PFAS statute, known as Amara's Law, which requires reporting of intentionally added PFAS and prohibits the sale of products containing intentionally added PFAS, subject to phase-in periods extending through 2032 (Minn. Stat. 116.943).

(j) **New Hampshire.** New Hampshire requires a manufacturer or other entity that sells firefighter personal protective equipment containing PFAS to provide written notice to the purchaser at the time of sale (N.H. Rev. Stat. 154:8-c).

(k) **New York.** New York requires point-of-sale disclosure of PFAS in firefighter personal protective equipment (N.Y. Gen. Bus. Law 391-u) and prohibits the manufacture, sale, and distribution of firefighting personal protective

equipment containing intentionally added PFAS beginning January 1, 2028 (N.Y. A. 3008-C (2025)).

(l) **Rhode Island.** Rhode Island requires a manufacturer of firefighter personal protective equipment to provide written notice to the purchaser at the time of sale if the equipment contains PFAS, effective January 1, 2025 (2024 R.I. Pub. Laws (H. 7356)).

(m) **Vermont.** Vermont requires a manufacturer that sells firefighter personal protective equipment containing PFAS to provide written notice to the purchaser at the time of sale (18 V.S.A. 1664), as part of a broader statutory program restricting intentionally added PFAS in consumer products.

(n) **Washington.** Washington requires a manufacturer that sells firefighter personal protective equipment containing PFAS to provide written notice to the purchaser at the time of sale (RCW 70A.400.030).

**B. The Construction of Turnout Gear and the Use of PFAS in Each Layer**

69. Structural firefighter turnout gear is the coat-and-trouser protective ensemble that firefighters wear to shield against heat, flame, water, and hazardous substances. It is designed and certified to a three-layer construction: an outer shell, a moisture barrier, and a thermal liner.

70. PFAS chemicals are used in and are contained in each of the three layers associated with firefighter turnout gear. The PFAS in each layer is either intentionally added during the manufacturing process, migrates during the manufacturing process to other layers, and/or migrates from layers containing intentionally added PFAS to other layers due to the ordinary contact between the layers that is expected in the ordinary course. The outer shell is commonly treated with PFAS-based durable water repellent

finishes to shed water and chemicals. The moisture barrier commonly consists of, or is laminated with, a PFAS-based membrane such as expanded polytetrafluoroethylene. The thermal liner and associated fabrics are, in many products, treated with or made from PFAS-containing materials, or in the ordinary course of manufacturing or wear and tear become contaminated with PFAS-containing materials from other layers that contain PFAS.

71. As a result, PFAS are present throughout the turnout gear that Plaintiffs purchased, not as an incidental contaminant but as an engineered feature specified, supplied, and applied by the Chemical Defendants, the Component Defendants, and the Gear Manufacturer Defendants.

**C. PFAS Are Present In and Migrate From Turnout Gear**

72. Independent, peer-reviewed scientific testing has detected PFAS in every layer of turnout gear of the kind Plaintiffs purchased, including the reflective tape applied to the outer surfaces of personal protective gear, the outer shell of the gear, the inner moisture barrier, and the inner thermal liner of the gear. This includes the products containing PFAS made, marketed, and/or sold by all of the Defendants and includes the gear made by the Gear Manufacturer Defendants and supplied by the Component Defendants. This testing confirms that PFAS are present in the finished gear at significant concentrations and are not limited to any single layer or component part.

73. That same testing, and the underlying science, establishes that PFAS migrates from turnout gear during ordinary use, handling, storage, and laundering and contaminates other surfaces, materials, gear, equipment, clothing and other property. PFAS transfer from the gear onto the skin of firefighters, into the air and surfaces of fire stations and its associated property, onto and into other exposed firefighter uniforms,

undergarments or other wearables, and into the equipment used to store and clean the gear. The turnout gear is therefore a key route of PFAS exposure and a substantial source of PFAS contamination of fire department property and environment.

74. The presence of PFAS in and its migration from the specific gear that Plaintiffs purchased are central to their claims. Plaintiffs allege, consistent with independent testing of comparable gear and, associated fire department property and environment, that all of the turnout gear purchased contained or was contaminated with PFAS.

**D. Defendants Knowledge and Decades-Long Concealment**

75. The Defendants' knowledge of the dangers of PFAS spans decades. In 1935, the former DuPont established Haskell Laboratories to study the toxicity of its chemicals. By the early 1960s, DuPont's own scientists had internally concluded that PFOA was toxic and should be handled with care, and 3M's scientists had reported that PFAS compounds enlarged the livers of laboratory animals. By 1978, internal studies had alerted 3M and DuPont that PFOA was accumulating in the blood of exposed workers. Despite this knowledge, the Defendants continued for decades to manufacture, market, and sell PFAS and PFAS-containing turnout gear as safe and fit for use while concealing what they knew.

76. For decades, Defendants possessed knowledge, through their own internal studies, industry associations, and the scientific literature, that PFAS are toxic, persistent, and bioaccumulative, and that PFAS exposure is associated with cancer and other serious disease. The Chemical Defendants in particular generated and controlled much of the early evidence of PFAS toxicity.

77. Despite that knowledge, Defendants did not disclose the presence or the dangers of PFAS in turnout gear. Instead, they marketed and sold the gear as safe, protective, and

appropriate for firefighting, and affirmatively represented the gear as protective equipment that safeguarded the health of its wearers.

78. Defendants failed to warn Plaintiffs, firefighters, or the public that the turnout gear contained PFAS, that PFAS would migrate from the gear, or that PFAS exposure posed health and contamination risks. Defendants concealed material facts they had a duty to disclose in order to preserve the market for PFAS chemistries and PFAS-containing gear.

### E. The Component and Textile Defendants Knowingly Supplied PFAS Materials

79. The Component Defendants knowingly manufactured and supplied the PFAS-containing outer-shell fabrics, moisture-barrier membranes and laminates, and thermal-liner materials that the Gear Manufacturer Defendants incorporated into finished turnout gear. They did so knowing that these materials contained PFAS and would be used in protective clothing worn by firefighters.

80. The Component Defendants specified, promoted, and supplied their PFAS-containing materials for use in turnout gear, and had knowledge of the toxicity and migration of PFAS. Their supply of these materials was a substantial factor in causing the PFAS content of the finished gear and the resulting harm to Plaintiffs, which is the basis for their inclusion as Defendants.

### F. The Common Supply Chain: The Chemical Defendants' PFAS and the Component Defendants' PFAS Materials Were Incorporated Into Every Plaintiff's Turnout Gear, Including Gear From Manufacturers Not Named as Defendants

81. The turnout gear that Plaintiffs purchased, were issued, and used was manufactured and sold under the Globe, Lion, Fire-Dex, Honeywell and Morning Pride, Innotex, Lakeland, Ricochet, and TecGen brands. Each of those finished-gear lines was

constructed from the same categories of PFAS-containing materials and chemistries that the Chemical Defendants and the Component Defendants manufactured, treated, and supplied. The moisture barriers used in that gear were manufactured and supplied by Defendant W.L. Gore & Associates, Inc. (including the barrier marketed as CROSSTECH) and Defendant Stedfast USA, Inc. (including the barrier marketed as STEDAIR), each of which is an expanded polytetrafluoroethylene or other fluoropolymer membrane that is itself a PFAS material. The outer-shell and thermal-liner fabrics used in that gear were manufactured and supplied by Defendants Southern Mills, Inc. (d/b/a TenCate Protective Fabrics), Safety Components Fabric Technologies, Inc., Milliken & Company, Elevate Textiles, Inc., and PBI Performance Products, Inc., and were treated with PFAS-based durable water repellent finishes. The PFAS and fluoropolymer chemistries used to make and to treat those membranes, fabrics, and finishes were manufactured and supplied by the Chemical Defendants, namely 3M Company and the DuPont-related Defendants (E.I. du Pont de Nemours and Company (n/k/a EIDP, Inc.), DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc.). Through this common chain of supply, the PFAS materials and chemistries that the Chemical Defendants and the Component Defendants manufactured and supplied were incorporated into the finished turnout gear that each Plaintiff purchased.

82. This chain of supply applies equally to the finished gear that was not manufactured by a named Gear Manufacturer Defendant. On information and belief, and consistent with the manufacturers' publicly available material specifications, the Lakeland turnout gear purchased by Plaintiffs the City of Kodiak and the Village of

Robbins, and the Ricochet and TecGen turnout gear purchased by the Town of Cicero and the City of Zion, was constructed with the same PFAS-containing moisture barriers supplied by Defendants W.L. Gore & Associates, Inc. and Stedfast USA, Inc., the same PFAS-containing outer-shell and thermal-liner fabrics supplied by Defendants Southern Mills, Inc., Safety Components Fabric Technologies, Inc., Milliken & Company, and PBI Performance Products, Inc., and the same PFAS and fluoropolymer chemistries supplied by the Chemical Defendants. Accordingly, the PFAS in the turnout gear used by every Plaintiff, whether or not the finished-gear manufacturer is named as a Defendant in this Complaint, was manufactured, supplied, and placed into the stream of commerce by the Chemical Defendants and the Component Defendants named in this Complaint.

**G. Harm to Plaintiffs**

83. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered substantial economic harm and property damage. Plaintiffs have incurred and will incur costs to test, retrieve, remove, dispose of, and replace the PFAS-containing turnout gear they purchased.

84. Plaintiffs also suffered benefit-of-the-bargain losses. They paid for turnout gear that was represented to be safe and protective but that was in fact contaminated with, and released, PFAS, and that is worth materially less than what they paid and were promised.

85. The property of Plaintiffs has been contaminated by PFAS that migrated from the gear, including the fire stations, storage areas, and laundering and cleaning equipment where the gear was and is kept and maintained. These harms include substantial economic harm and property damage claims incurred by Plaintiffs as public entities and are not claims for personal injury.

**H. PFAS Migrates From the Gear and Contaminates Other Property of the Plaintiffs**

86. PFAS in the Defendants' turnout gear does not remain inert within the gear. Through ordinary wear, abrasion, heat exposure, off-gassing, shedding of fibers and particles, and routine cleaning and laundering, PFAS migrates from the gear onto and into other property of the Plaintiffs.

87. As a direct result, PFAS from Defendants' gear has contaminated property of Plaintiffs distinct from the gear itself, including, without limitation, fire station surfaces, walls, ceilings, floors, furniture, gear storage and turnout rooms, living and sleeping quarters, other firefighter uniforms and wearables, apparatus and vehicle cab interiors, self-contained breathing apparatus (SCBA), hand tools and equipment, gear washers and extractors and their associated drains and plumbing, ventilation systems, and the soil, stormwater, groundwater, and wastewater at and around fire stations and training facilities.

88. The contamination of this other property has required, and will continue to require, the Plaintiffs to incur costs to test, sample, decontaminate, remediate, and where necessary replace that other property, and to characterize and address soil and water impacts, which costs are separate and apart from the cost of the turnout gear itself.

89. Defendants owed Plaintiffs duties independent of any contract or warranty, including the duty to design and manufacture products that are not unreasonably dangerous, the duty to warn of known hazards to people and property posed by Defendants' PFAS-contaminated products, and the duty not to contaminate Plaintiffs' property and environment. Accordingly, Plaintiffs' claims are not barred or limited by the so-called economic loss doctrine.

## V. RICO ENTERPRISE ALLEGATIONS

90. At all relevant times, Defendants formed and operated an association-in-fact enterprise within the meaning of 18 U.S.C. 1961(4), referred to herein as the "PFAS Concealment Enterprise." The Enterprise consisted of the Chemical Defendants, the Gear Manufacturer Defendants, and the Component Defendants, together with their trade associations and agents.

91. The Enterprise had a common purpose: to conceal the presence and dangers of PFAS in turnout gear and to continue manufacturing, marketing, and selling PFAS chemistries and PFAS-containing turnout gear at maximum profit while avoiding the costs of reformulation, warnings, remediation, and the development of safer PFAS-free alternatives to their products.

92. The Enterprise had a structure and relationships separate and apart from the pattern of racketeering activity. Its members were linked through supply relationships, contractual dealings, joint industry associations, standard-setting participation, and coordinated communications, and the Enterprise functioned as a continuing unit that would exist apart from the racketeering acts alleged.

93. Each Defendant participated in the conduct of the Enterprise affairs. The Chemical Defendants supplied PFAS and suppressed evidence of its toxicity; the Component Defendants supplied PFAS-containing materials and represented them as suitable for protective clothing; and the Gear Manufacturer Defendants incorporated those materials into finished gear and marketed the gear as safe. Each Defendant played a role in furthering the common purpose.

94. Defendants engaged in a pattern of racketeering activity as defined by 18 U.S.C. 1961(1) and (5), consisting of repeated acts of mail fraud (18 U.S.C. 1341) and wire

fraud (18 U.S.C. 1343). Over a period of years, Defendants used the United States mails and interstate wires to transmit marketing materials, product specifications, safety representations, invoices, and communications that they knew contained material misrepresentations and omissions concerning PFAS in turnout gear.

95. The predicate acts of mail fraud and wire fraud included, without limitation: (a) product catalogs, specification sheets, technical data sheets, and marketing and advertising materials representing that turnout gear was safe and suitable for firefighting use while omitting the presence and hazards of PFAS; (b) representations of compliance with NFPA 1971 and related standards, and third-party certification and testing communications, that concealed or failed to disclose the PFAS content of the gear and its migration and health risks; (c) invoices, quotations, order acknowledgments, and shipping and delivery documentation transmitted to effectuate the sale and interstate shipment of PFAS-containing gear; and (d) communications directed to fire-service associations, purchasing officials, and standards organizations that misrepresented or concealed the Defendants' knowledge of the toxicity, persistence, bioaccumulation, and migration of PFAS in turnout gear.

96. Each of these communications was transmitted through the United States mails or by interstate wire in furtherance of the Enterprise's common purpose. Plaintiffs will identify specific predicate communications, including their dates, senders, recipients, and contents, following discovery and further investigation.

97. The predicate acts were related and continuous. They shared the common purpose, methods, and victims described herein, and they were part of Defendants'

regular way of conducting business over a substantial period, satisfying both the relatedness and continuity requirements of a RICO pattern.

98. Plaintiffs are direct purchasers of PFAS-containing turnout gear. They purchased the gear directly from Defendant manufacturers and their authorized dealers and distributors, and their injuries flow directly from Defendants' racketeering conduct. Plaintiffs therefore have standing under 18 U.S.C. 1964(c) and are not barred by the indirect-purchaser rule.

## VI. TOLLING AND FRAUDULENT CONCEALMENT

99. Any applicable statute of limitations has been tolled by the discovery rule. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, that the turnout gear they purchased contained PFAS, that PFAS migrated from the gear, or that PFAS posed the hazards alleged, until shortly before this action was filed.

100. Any applicable statute of limitations has also been tolled by Defendants' fraudulent concealment. Defendants affirmatively concealed and failed to disclose the presence and dangers of PFAS in turnout gear, and Plaintiffs reasonably relied on Defendants' representations that the gear was safe. Defendants are estopped from asserting any limitations defense based on their own concealment.

## VII. CAUSES OF ACTION

### A. COUNTS ON BEHALF OF ALL PLAINTIFFS

The following counts are asserted by all Plaintiffs against the Defendants identified in each count.

**COUNT I - Violation of RICO, 18 U.S.C. 1962(c) (Against All Defendants, On Behalf of All Plaintiffs)**

101. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

102. Each Defendant is a "person" within the meaning of 18 U.S.C. 1961(3) and 1962(c), and the PFAS Concealment Enterprise is an "enterprise" within the meaning of 18 U.S.C. 1961(4) that engaged in, and whose activities affected, interstate commerce.

103. Each Defendant was employed by or associated with the Enterprise and conducted or participated, directly or indirectly, in the conduct of the Enterprise affairs through a pattern of racketeering activity.

104. The pattern of racketeering activity consisted of multiple, related, and continuous predicate acts of mail fraud and wire fraud, in violation of 18 U.S.C. 1341 and 1343, by which Defendants transmitted material misrepresentations and omissions concerning PFAS in turnout gear.

105. As a direct and proximate result of Defendants' violations of 18 U.S.C. 1962(c), Plaintiffs were injured in their business and property, including through the purchase of PFAS-containing gear and the costs of testing, removal, disposal, and replacement.

106. Plaintiffs are entitled to recover treble damages, costs, and reasonable attorneys fees under 18 U.S.C. 1964(c).

**COUNT II - RICO Conspiracy, 18 U.S.C. 1962(d) (Against All Defendants, On Behalf of All Plaintiffs)**

107. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

108. Defendants agreed and conspired, in violation of 18 U.S.C. 1962(d), to violate 18 U.S.C. 1962(c), that is, to conduct and participate in the affairs of the PFAS Concealment Enterprise through a pattern of racketeering activity.

109. Each Defendant knowingly agreed to the overall objective of the conspiracy and to the commission of at least two predicate acts of racketeering, or otherwise agreed to participate in the conduct of the Enterprise with knowledge of and intent to further its unlawful purpose.

110. Defendants committed overt acts in furtherance of the conspiracy, including the marketing and sale of PFAS-containing turnout gear and the concealment of the presence and dangers of PFAS.

111. As a direct and proximate result of the conspiracy, Plaintiffs were injured in their business and property and are entitled to treble damages, costs, and reasonable attorneys fees under 18 U.S.C. 1964(c).

**COUNT III - Strict Products Liability, Design Defect (Against the Gear Manufacturer Defendants and Component Defendants, On Behalf of All Plaintiffs)**

112. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

113. The Gear Manufacturer Defendants and Component Defendants designed, manufactured, and sold turnout gear and turnout gear components. That gear and those components were expected to and did reach Plaintiffs without substantial change in the condition in which they were sold.

114. The turnout gear and components were defective in design because they contained PFAS that migrated from the gear and rendered the gear unsafe for its intended and

foreseeable use, and because safer, feasible alternative designs without PFAS were available.

115. The foreseeable risks of harm posed by the PFAS in the gear outweighed the benefits of the design, and the gear failed to perform as safely as an ordinary purchaser would expect.

116. The design defect was a direct and proximate cause of the harm to Plaintiffs, including the costs of testing, removal, disposal, and replacement and the loss of the benefit of the bargain. Plaintiffs are entitled to compensatory damages.

**COUNT IV - Strict Products Liability, Failure to Warn (Against the Gear Manufacturer Defendants and Component Defendants, On Behalf of All Plaintiffs)**

117. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

118. The Gear Manufacturer Defendants and Component Defendants knew or reasonably should have known that the turnout gear and components contained PFAS and that PFAS posed the health and contamination risks alleged herein.

119. These Defendants failed to provide adequate warnings or instructions regarding the presence of PFAS, the migration of PFAS from the gear, and the associated risks, which rendered the gear defective and unreasonably dangerous.

120. Adequate warnings would have altered the conduct of Plaintiffs, who would not have purchased the gear, or would have handled and replaced it differently, had the risks been disclosed.

121. The failure to warn was a direct and proximate cause of the harm to Plaintiffs, and they are entitled to compensatory damages.

**COUNT V - Negligence (Against All Defendants, On Behalf of All Plaintiffs)**

122. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

123. Each Defendant owed Plaintiffs a duty of reasonable care in the design, manufacture, supply, testing, marketing, and sale of PFAS, PFAS-containing components, and turnout gear, and a duty to warn of known or knowable hazards.

124. Each Defendant breached that duty by manufacturing and supplying PFAS-containing products for use in turnout gear, by failing to test adequately, by failing to warn, and by concealing the presence and dangers of PFAS.

125. Defendants' breaches were a direct and proximate cause of the harm to Plaintiffs, which was reasonably foreseeable.

126. Plaintiffs are entitled to compensatory damages, and to punitive damages where permitted, for Defendants' negligent conduct.

**COUNT VI - Fraudulent Concealment, Fraudulent Misrepresentation, and Negligent Misrepresentation (Against All Defendants, On Behalf of All Plaintiffs)**

127. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

128. Defendants had knowledge of material facts concerning the presence and dangers of PFAS in turnout gear that were not known or reasonably discoverable by Plaintiffs, and Defendants had a duty to disclose those facts.

129. Defendants concealed those material facts and affirmatively represented that the turnout gear was safe and protective, representations that were false and that Defendants knew to be false or made with reckless disregard for the truth.

130. Defendants intended that Plaintiffs rely on their concealment and misrepresentations, and Plaintiffs justifiably relied by purchasing and continuing to use PFAS-containing gear.

131. As a direct and proximate result, Plaintiffs suffered harm and are entitled to compensatory damages, and to punitive damages where permitted.

132. In the alternative, and without regard to intent, the Defendants negligently misrepresented and negligently failed to disclose material facts concerning the presence and hazards of PFAS in turnout gear, on which Plaintiffs justifiably relied to their detriment, and the Defendants are liable to Plaintiffs for negligent misrepresentation.

**COUNT VII - Civil Conspiracy (Against All Defendants, On Behalf of All Plaintiffs)**

133. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

134. Defendants knowingly and willfully agreed and combined to accomplish the unlawful objectives alleged herein, including the concealment of PFAS in turnout gear and the continued marketing and sale of that gear as safe.

135. Each Defendant committed overt acts in furtherance of the conspiracy, and each is liable for the acts of its co-conspirators committed in furtherance of the common design.

136. As a direct and proximate result of the conspiracy, Plaintiffs suffered harm and are entitled to compensatory and punitive damages as permitted by law.

**COUNT VIII - Unjust Enrichment (Against All Defendants, On Behalf of All Plaintiffs)**

137. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

138. Plaintiffs conferred a benefit on Defendants by purchasing PFAS-containing turnout gear and components, and by paying prices that reflected Defendants' representations that the gear was safe and protective.

139. Defendants knew of and accepted that benefit, and retention of the benefit under these circumstances, given Defendants' concealment and misrepresentations, would be inequitable and unjust.

140. Plaintiffs are entitled to restitution and disgorgement of the amounts by which Defendants were unjustly enriched.

**COUNT IX - Breach of Implied Warranty of Merchantability (Against the Gear Manufacturer Defendants and Component Defendants, On Behalf of All Plaintiffs)**

141. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

142. The Gear Manufacturer Defendants and Component Defendants are merchants with respect to turnout gear and turnout gear components, and their sale of that gear carried an implied warranty of merchantability.

143. The turnout gear was not merchantable because it contained and released PFAS, was not fit for the ordinary purpose of protective firefighting clothing, and would not pass without objection in the trade for gear that is safe and free of undisclosed toxic contamination.

144. The breach of the implied warranty of merchantability was a direct and proximate cause of the harm to Plaintiffs, who are entitled to compensatory damages.

**COUNT X - Breach of Implied Warranty of Fitness for a Particular Purpose (Against the Gear Manufacturer Defendants and Component Defendants, On Behalf of All Plaintiffs)**

145. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

146. At the time of sale, these Defendants had reason to know the particular purpose for which the turnout gear was required, namely to protect firefighters safely during firefighting operations, and knew that Plaintiffs relied on their skill and judgment to select and furnish suitable gear.

147. Plaintiffs did in fact rely on Defendants' skill and judgment, and Defendants thereby impliedly warranted that the gear was fit for that particular purpose.

148. The turnout gear was not fit for that particular purpose because it contained and released PFAS, and the breach of that implied warranty was a direct and proximate cause of the harm to Plaintiffs, entitling them to compensatory damages.

**COUNT XI - Breach of Express Warranty (Against the Gear Manufacturer Defendants and Component Defendants, On Behalf of All Plaintiffs)**

149. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

150. The Gear Manufacturer Defendants and Component Defendants, through their catalogs, specifications, technical data sheets, labeling, marketing, and advertising, expressly warranted to Plaintiffs that the turnout gear and its components were safe, high-performance, suitable for firefighting use, and compliant with applicable standards, including NFPA 1971.

151. These express representations became part of the basis of the bargain for Plaintiffs' purchases of the turnout gear.

152. The turnout gear did not conform to those express warranties because it contained and released PFAS, rendering the gear unsafe and unfit for its intended and foreseeable use.

153. As a direct and proximate result of the breach of these express warranties, Plaintiffs have been damaged, including through the costs of testing, decontamination, removal, disposal, and replacement of the gear and the loss of the benefit of their bargain.

## B. STATE-SPECIFIC COUNTS ON BEHALF OF THE PLAINTIFFS IN EACH STATE

The following counts are asserted by the Plaintiffs located in each represented State under the consumer-protection and unfair-trade-practices statutes of that State.

154. Certain State consumer-protection statutes require a claimant to serve a pre-suit demand or notice as a condition of bringing suit or of recovering damages. The Plaintiffs located in Georgia and Massachusetts are subject to such requirements under, respectively, the Georgia Fair Business Practices Act (O.C.G.A. 10-1-399) and the Massachusetts Regulation of Business Practices for Consumers Protection Act (Mass. Gen. Laws ch. 93A). Accordingly, the consumer-protection counts of the Plaintiffs located in Georgia and Massachusetts are not asserted in this Complaint; those Plaintiffs will serve the required statutory demand concurrently with the filing of this Complaint and will seek leave to amend to add those counts after the applicable demand period has run. In addition, the California Consumers Legal Remedies Act (Cal. Civ. Code 1782) requires a thirty-day pre-suit notice as a condition of recovering damages; the Plaintiffs located in California therefore seek injunctive relief under that Act now and will seek leave to amend to add their California Consumers Legal Remedies Act damages claim

after the thirty-day notice period has run. This reservation does not affect any other count of this Complaint, each of which is asserted by those Plaintiffs.

**COUNT XII - Violation of the Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. 45.50.471 et seq.) (On Behalf of the Plaintiffs Located in Alaska)**

155. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

156. The Plaintiffs located in Alaska assert this Count under the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. 45.50.471 et seq., which prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce. Defendants engaged in unfair and deceptive acts and practices by manufacturing, marketing, and selling PFAS-containing turnout gear while concealing and misrepresenting the presence and hazards of PFAS.

157. As a direct and proximate result, the Plaintiffs located in Alaska suffered an ascertainable loss and are entitled to the relief available under the Alaska Unfair Trade Practices and Consumer Protection Act, including actual damages, treble or statutory damages, restitution, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT XIII - Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code 17200 et seq.) (On Behalf of the Plaintiffs Located in California)**

158. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

159. The Plaintiffs located in California assert this Count under the California Unfair Competition Law, Cal. Bus. & Prof. Code 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice. Defendants engaged in unlawful, unfair, and

fraudulent business practices by manufacturing, marketing, and selling PFAS-containing turnout gear while concealing and misrepresenting the presence and hazards of PFAS.

160. As a direct and proximate result, the Plaintiffs located in California suffered injury in fact and lost money or property and are entitled to the relief available under the Unfair Competition Law, including restitution and injunctive relief.

**COUNT XIV - Violation of the California False Advertising Law (Cal. Bus. & Prof. Code 17500 et seq.) (On Behalf of the Plaintiffs Located in California)**

161. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

162. The Plaintiffs located in California assert this Count under the California False Advertising Law, Cal. Bus. & Prof. Code 17500 et seq., which prohibits the dissemination of untrue or misleading statements in connection with the sale of goods. Defendants disseminated untrue and misleading statements, and omitted material facts, concerning the safety and PFAS content of their turnout gear.

163. As a direct and proximate result, the Plaintiffs located in California suffered injury in fact and lost money or property and are entitled to the relief available under the False Advertising Law, including restitution and injunctive relief.

**COUNT XV - Violation of the California Consumers Legal Remedies Act (Cal. Civ. Code 1750 et seq.) (On Behalf of the Plaintiffs Located in California)**

164. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

165. The Plaintiffs located in California assert this Count under the California Consumers Legal Remedies Act, Cal. Civ. Code 1750 et seq., which prohibits unfair or deceptive acts or practices in a transaction for goods. Defendants violated the Act by

representing that their turnout gear had characteristics and qualities it did not have and by concealing the presence and hazards of PFAS. Consistent with Cal. Civ. Code 1782, the California Plaintiffs seek injunctive relief under the Act now and will seek leave to amend to add a claim for damages after the thirty-day statutory notice period has run.

166. As a direct and proximate result, the Plaintiffs located in California are entitled to the relief available under the Consumers Legal Remedies Act, including injunctive relief and, following the statutory notice period, actual damages, restitution, and reasonable attorneys' fees and costs.

**COUNT XVI - Violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. 42-110a et seq.) (On Behalf of the Plaintiffs Located in Connecticut)**

167. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

168. The Plaintiffs located in Connecticut assert this Count under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. 42-110a et seq., which prohibits unfair or deceptive acts or practices in the conduct of trade or commerce and affords a private right of action under Conn. Gen. Stat. 42-110g. Defendants engaged in unfair and deceptive acts and practices by manufacturing, marketing, and selling PFAS-containing turnout gear while concealing and misrepresenting the presence and hazards of PFAS. A copy of this Complaint is being mailed to the Attorney General and the Commissioner of Consumer Protection as provided by Conn. Gen. Stat. 42-110g(c).

169. As a direct and proximate result, the Plaintiffs located in Connecticut suffered an ascertainable loss of money or property and are entitled to the relief available under the Connecticut Unfair Trade Practices Act, including actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT XVII - Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.) (On Behalf of the Plaintiffs Located in Illinois)**

170. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

171. The Plaintiffs located in Illinois assert this Count under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., which prohibits unfair or deceptive acts or practices in the conduct of trade or commerce. Defendants engaged in unfair and deceptive acts and practices by manufacturing, marketing, and selling PFAS-containing turnout gear while concealing and misrepresenting the presence and hazards of PFAS.

172. As a direct and proximate result, the Plaintiffs located in Illinois were injured and are entitled to the relief available under the Illinois Consumer Fraud and Deceptive Business Practices Act, including actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT XVIII - Violation of the Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. 1345.01 et seq.) (On Behalf of the Plaintiffs Located in Ohio)**

173. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

174. The Plaintiffs located in Ohio assert this Count under the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. 1345.01 et seq., which prohibits unfair, deceptive, and unconscionable acts and practices in connection with consumer transactions. Defendants engaged in unfair, deceptive, and unconscionable acts and practices by manufacturing, marketing, and selling PFAS-containing turnout gear while concealing and misrepresenting the presence and hazards of PFAS.

175. As a direct and proximate result, the Plaintiffs located in Ohio were injured and are entitled to the relief available under the Ohio Consumer Sales Practices Act, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT XIX - Violation of the Oklahoma Consumer Protection Act (15 Okla. Stat. 751 et seq.) (On Behalf of the Plaintiffs Located in Oklahoma)**

176. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

177. The Plaintiffs located in Oklahoma assert this Count under the Oklahoma Consumer Protection Act, 15 Okla. Stat. 751 et seq., which prohibits unfair and deceptive trade practices in the conduct of trade or commerce. Defendants engaged in unfair and deceptive trade practices by manufacturing, marketing, and selling PFAS-containing turnout gear while concealing and misrepresenting the presence and hazards of PFAS.

178. As a direct and proximate result, the Plaintiffs located in Oklahoma suffered an ascertainable loss and are entitled to the relief available under the Oklahoma Consumer Protection Act, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT XX - Violation of the South Carolina Unfair Trade Practices Act (S.C. Code Ann. 39-5-10 et seq.) (On Behalf of the Plaintiffs Located in South Carolina)**

179. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

180. The Plaintiffs located in South Carolina assert this Count under the South Carolina Unfair Trade Practices Act, S.C. Code Ann. 39-5-10 et seq., which prohibits unfair or deceptive acts or practices in the conduct of trade or commerce. Defendants engaged in unfair and deceptive acts and practices by manufacturing, marketing, and

selling PFAS-containing turnout gear while concealing and misrepresenting the presence and hazards of PFAS, conduct that has an impact upon the public interest.

181. As a direct and proximate result, the Plaintiffs located in South Carolina suffered an ascertainable loss and are entitled to the relief available under the South Carolina Unfair Trade Practices Act, including actual damages, treble damages, injunctive relief, and reasonable attorneys' fees and costs.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and grant the following relief:

a. Compensatory damages, including the costs to test, retrieve, remove, dispose of, and replace PFAS-containing turnout gear, and the loss of the benefit of the bargain;

b. Treble damages, costs, and reasonable attorneys fees under 18 U.S.C. 1964(c);

c. Restitution and disgorgement of Defendants' unjust enrichment;

d. Punitive and exemplary damages where permitted by law;

e. Injunctive and equitable relief, including a court-supervised program to test, replace, and dispose of PFAS-containing turnout gear and to issue corrective notice;

f. Pre-judgment and post-judgment interest as allowed by law;

g. Attorneys fees, expenses, and costs of suit as allowed by law; and

h. Such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

182. Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 3, 2026

Respectfully submitted by,

/s/ David Grossman
David Grossman, Esq.
dgrossman@kandgfirm.com
Cell: 631-459-9241

/s/ Jan Schlichtmann
Jan Schlichtmann, Esq.
MA BBO #445900
jan@schlichtmannlaw.com
Cell: 978-804-2553

GROSSMAN & KELLY LLP
1248 Montauk Highway
West Islip, New York 11795
Telephone: (631) 314-4996
Facsimile: (516) 686-6771

Counsel for Plaintiffs